**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LEROY BYRD, ANDRE STEVENSON, AND TYREESHA ABDUSSABUR | |
| *Plaintiffs,* | CIVIL ACTION NO. 16-02275 |
| v. | |
| ELWYN, AND ELWYN, INC., | |
| *Defendants.* | |

**PAPPERT, J.**                                                              **September 30, 2016**

**MEMORANDUM**

Plaintiffs Leroy Byrd ("Byrd"), Andre Stevenson ("Stevenson") and Tyreesha Abdussabur ("Abdussabur") (collectively "plaintiffs") sued their former employer, Elwyn and Elwyn, Inc.[1] under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). The essence of their Complaint is that Byrd and Stevenson rebuffed repeated sexual advances from Christine King-Waymer ("King"), an Administrative Coordinator at Elwyn, and as a result all three plaintiffs were harassed, retaliated against and ultimately terminated. Despite this straightforward premise, the plaintiffs' Amended Complaint, (ECF No. 12), evolved into twelve distinct purported causes of action. Before the Court is Elwyn's Motion to Dismiss and Motion to Strike Plaintiffs' Amended Complaint. (ECF No. 15.) Plaintiffs' filed their Response on July 15, 2016, (ECF No. 17), and the Court held oral argument on September 15, 2016, (ECF No. 21). For the reasons that follow, the Court grants the motion in part and denies it in part.

---

[1]        Elwyn asks that the Court dismiss all claims against "Elwyn, Inc." claiming it is not a legal entity. (Defs. Mot. to Dismiss and Mot. to Strike, ECF No. 15, at 5.) The Court is unable to make that determination at this stage. *Cf. id.*; (Pl's. Resp. in Opp'n to Mot. to Dismiss and Mot. to Strike, ECF No. 17, at Exs. A, B.) For ease of reference, the Court will refer to the defendants as Elwyn throughout this Memorandum.

1

**I.**

 Byrd, Stevenson and Abdussabur were coworkers at Elwyn during the times relevant to this action.[2]  The plaintiffs appear to be well-acquainted with one another and with King.  Byrd and Abdussabur lived together and raised two children. (Am. Compl. ¶ 20.)  Stevenson met King at a Christmas party before he began working for Elwyn, (*id.* ¶¶ 58(t)), and Byrd also knew King before he started working for Elwyn, (*see id.* ¶¶ 58(a), (j), (m)).

**A.**

 King offered Byrd a position with Elwyn in April 2012.  (*Id.* ¶ 58(l).)  Byrd worked for Elwyn for just over three years before he was fired on August 23, 2015.  (*See id.* ¶ 23.)  Even before Byrd started with Elwyn, King had a history of directing sexually suggestive or explicit comments toward him.  (*See id.* ¶¶ 58(a), 58(g).)  This harassment continued after Byrd began working for the company: from the very start, King conditioned satisfactory approval of Byrd's new employee introductory period on Byrd's tolerating and not reporting her harassment. (*See id.* ¶ 61.)

 King's offensive behavior persisted throughout Byrd's employment with Elwyn.  In September or October 2012 King repeated comments she had made before Byrd's hiring, namely that she "could tell by the way [Byrd] stands, that he has a big dick." (*Id.* ¶ 58(g).)  In December 2012 King asked Byrd and Stevenson drive to her home, where she greeted them in a "revealing leopard-print robe," offered them gin, and told them she did not "have any good men in [her] life."  (*Id.*)

---

[2]      The Amended Complaint does not allege or explain what type of business Elwyn is or what services it provides.

2

In February 2014 Stevenson reported King to Elwyn's "ACCESS Department"[3] for sexual harassment after she threatened to demote him for rebuffing her sexual advances.  (*Id.* ¶¶ 11, 45.)   Stevenson offered Byrd's name "as a second victim of the harassment."  (*Id.*)  Byrd alleges that beginning in February 2014 he was repeatedly reprimanded at work.  He was also written up for arriving late to work the same month, (*id.* ¶ 12), and for failing to call King directly when he was off work for the day, "although the policy states that employees can notify the payroll editor" instead.  (*Id.*)  These reprimands continued until December 2014.  (*Id.*)  King continued to make sexual comments to Byrd throughout 2014; at a Christmas party that year, Byrd and Stevenson heard King say "[six] girls and [six] guys, what are we going to do here?"  (*Id.* ¶58(ff).)

Around January of 2015, Byrd complained about sexual harassment and retaliation to Elwyn.  (*Id.* ¶ 13.)  Byrd alleges his complaint led to further retaliation against him by King.  Specifically, in February 2015 King reprimanded and disciplined Byrd for his work performance and placed him on a performance improvement plan.  (*Id.* ¶¶ 14–15.)  Around the same time, Byrd was also reprimanded and disciplined for taking too much time off from work.  (*Id.* ¶ 16.)

Byrd's report to Elwyn apparently did not deter King from making sexually suggestive comments in the workplace.  In May 2015 King "commented about sex 'horsie style'" to Byrd and made comments about "how to properly please her."  (*Id.* ¶ 17.)  In June or July 2015 King "continuously and repeatedly" asked Byrd if his girlfriend, Abdussabur, "satisf[ied] him," and suggested that she did not believe Byrd and Abdussabur's relationship was "working out."  (*Id.* ¶ 58(kk).)  King also repeatedly asked Byrd "what sexual positions he used with [Abdussabur]."  (*Id.* ¶ 58(p).)  In June or July 2015, Byrd heard King state "'mm hmm, that's it'" when referring

---

[3] The Amended Complaint does not explain or define "ACCESS Department."

to men in the workplace.  (*Id.* ¶ 58(c).)  He also alleges that King "repeatedly and continuously leered" at him throughout his employment.  (*Id.* ¶ 58(f).)

While on a business trip in Atlantic City in late June or early July 2015, King allegedly invited Byrd to her hotel room, asked him for a hug, and then hugged him.  (*Id.* ¶ 18.)  King then told Byrd to "[c]ome back in an hour," before "grabbing [Byrd's] ass."  (*Id.*)  Byrd rebuffed these advances.  (*Id.*)  After returning from the business trip, King suspended both Byrd and Abdussabur.  (*Id.* ¶ 19.)  That same day, King initiated an investigation into whether Byrd committed theft.  (*Id.* ¶ 21.)  On August 7, 2015 King drafted "a second subsequent statement" regarding her investigation into whether Byrd committed theft.  (*Id.* ¶ 22.)  Approximately three weeks later, on August 27, 2015, King fired Byrd.

On September 23, 2015 Byrd filed a charge of discrimination against Elwyn with the EEOC alleging sexual harassment and retaliation.  (*Id.* ¶ 41.)  Byrd alleges that Elwyn's "Employee Relations Generalist" then drafted a second termination letter on October 1, 2015 and backdated that letter to September 29, 2015 so that it would predate an internal sexual harassment complaint Stevenson previously filed with Elwyn.  (*Id.* ¶ 27.)

**B.**

Abdussabur also worked for Elwyn during this time period.  The fact that Abdussabur and Byrd lived together and had two children was openly known at Elwyn.  (*Id.* ¶ 20.)  King's inappropriate remarks extended to Abdussabur as well.  In September or October 2012 she made various comments to Abdussabur, including "I can tell why you're into [Byrd]," "I can tell by the way he walks he puts it down in the bedroom," and "I know [Byrd's] packing."  (*Id.* ¶ 58(h).)  In 2014, King told Abdussabur that Byrd had not married her yet "because of her attitude." (*Id.* ¶ 58(cc).)  King also made inappropriate comments about another male employee in front of

Abdussabur, (*id.* ¶ 58(i)), and said that she was "not hiring any more females in this department," (*id.* ¶ 58(e)).

On August 5, 2015 King suspended Abdussabur and began investigating whether Abdussabur had committed "workplace violence." (*Id.* ¶ 35.)  On August 7, 2015 King drafted a statement regarding her investigation into whether Abdussabur committed workplace violence and forwarded it to another department at Elwyn.  (*Id.* ¶ 22.)  On or about August 27, 2015, King fired Abdussabur for "violence in the workplace," (*id.* ¶ 38.)  King upheld that decision on September 10 or 11, 2015.  (*Id.* ¶ 39.)

Following her termination, Abdussabur filed for and received unemployment benefits on a biweekly basis.  Elwyn did not contest those benefits until on or about September 25, 2015— two days after Byrd filed his charge of discrimination with the EEOC.  (*Id.* ¶ 40.)

**C.**

Stevenson alleges a similar pattern of inappropriate conduct by King during his time with Elwyn.  King offered Stevenson a position with Elwyn at a Christmas party in 2012.  (*Id.* ¶ 58(v).)  Stevenson alleges that beginning almost immediately and continuing into 2013, she "began making repeated unwanted personal phone calls" to him regarding non-work-related matters.  (*Id.* ¶ 58(w).)  King then told Stevenson in December 2013 or January 2014 she was unhappy with her marriage and made "highly inappropriate and sexually suggestive comments about . . . Stevenson's wife."  (*Id.* ¶ 58(z).)  Stevenson felt the effects of King's behavior from coworkers, as well.  Between  2012 and 2014 Stevenson repeatedly heard from colleagues that King had "a thing" for him and was "sexually attracted" to him.  (*Id.* ¶¶ 58(hh), 58(ii).)

Stevenson rebuffed sexual advances from King in January 2014.  (*Id.* ¶¶ 45, 62.)  When he did, King threatened to demote him.  (*Id.* ¶¶ 45, 62.)  King also made "inappropriate

comments" about Stevenson's wife when he made clear that her conduct was unwelcome.  (*Id.* ¶ 45.)  Stevenson formally reported King's sexual harassment to Elwyn in February 2014.  (*Id.* ¶¶ 11, 46.)

Stevenson alleges that this report set in motion a series of retaliatory acts by King and other supervisors at Elwyn.  In February 2014 Elwyn's Executive Director of Organizational Development requested a copy of Stevenson's job description.  (*Id.* ¶ 47)  The same month, Stevenson's job description was altered; he was subjected to undesirable, remedial, humiliating, more difficult and more onerous work duties.  (*Id.* ¶ 48.)  In April 2014, King disciplined Stevenson "for swiping in late" but did not discipline at least some female employees who also arrived late to work.  (*Id.* ¶ 49.)  On September 30, 2015 King approached Stevenson "with completely new behavior out of nowhere" by requesting his disciplinary paperwork for arriving late.  (*Id.* ¶ 50.)  The same day, Stevenson reported King's conduct to Elwyn's Executive Director of Organization Development and asked about the outcome of his February 2014 sexual harassment complaint.  (*Id.* ¶ 51.)

Stevenson told Elwyn or their third-party Family and Medical Leave Act ("FMLA") administrator in September that he "needed to take medical leave for a serious health condition." (*Id.* ¶ 89.)  While on leave, on or about December 22, 2015, Stevenson received a letter from "Elwyn and/or Cigna" informing him that his FMLA leave would expire on December 29, 2015 and that he would be required to report back to work on that date.  (*Id.* ¶ 92.)  Stevenson missed work between January 4 and January 6, 2016 and again on January 11, 2016.   Elwyn retaliated against him for doing so—on January 29, 2016 he was docked four vacation days and disciplined under Elwyn's "Unexcused or Excessive Absenteeism Policy," ostensibly because his FMLA leave had not been approved.  (*Id.* ¶ 93.)  He was also informed that the discipline would be

reflected in his personnel file for the duration of his employment, "affecting all future promotional and transfer opportunities." (*Id.*)  Stevenson was disciplined again on January 21, 2016 for attending work after applying for FMLA leave.  (*Id.* ¶ 94.)  On January 29, 2016, Elwyn's Director of Operations Steven Shaud ("Shaud") required Stevenson "to undergo and complete an FBI fingerprint analysis."  (*Id.* ¶ 98.)

Stevenson took additional FMLA leave between January 29, 2016 and March 13, 2016. (*Id.* ¶ 99.)  When Stevenson returned to work on March 14, 2016 he was informed that his leave had not been approved.  (*Id.* ¶¶ 100–01.)  Because he felt that his serious health condition would require him to take additional medical leave, Stevenson gave Elwyn two-weeks notice of his resignation on March 14, 2016.   (*Id.* ¶ 103; *see also id.* ¶ 105.)  Elwyn fired Stevenson on March 16, 2016.  (*Id.* ¶ 105.)

## II.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citation omitted).  While a complaint need not include detailed facts, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555)).

*Twombly* and *Iqbal* require the Court to take three steps to determine whether the Amended Complaint will survive Elwyn's motion to dismiss.  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  First, it must "take note of the elements the plaintiff must

plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Next, it must identify the allegations that are no more than legal conclusions and thus "not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Finally, where the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).  This inquiry does not impose a probability requirement on plaintiffs.  *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (citing *Twombly*, 550 U.S. at 545)).  Rather, it "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* (quoting *Twombly*, 550 U.S. at 545).

### III.

Federal Rule of Civil Procedure 15(a) directs courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a).  While "leave to amend should be 'freely given,' a district court has discretion to deny . . . amend[ment] if it is apparent from the record that . . . the amendment would be futile." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F3d. 107, 116 (3d Cir. 2003).  The decision to grant leave to amend is within the sound discretion of the district court. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001) (citations omitted).

Amendment is futile where "the complaint, as amended, would fail to state a claim on which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) (internal citations omitted)).  In assessing futility, a district court should apply "the same standard of legal sufficiency [that] applies under Rule 12(b)(6)." *Id.*

**IV.**

<u>Count I — Retaliation</u>[4]

Count I alleges retaliation in violation of Title VII on behalf of Byrd.  To establish a viable retaliation claim under Title VII, a plaintiff must allege facts to show: (1) he engaged in protected activity; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).

 "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made unlawful by Title VII."  *Moore*, 461 F.3d, at 341.  Byrd alleges that he reported King's sexual harassment and rebuffed her sexual advances, (Am. Compl. ¶¶ 13, 18), either one of which could constitute protected activity.  *See Daniels v. School Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (finding that "informal protests of discriminatory employment practices, including making complaints to management" are protected activity); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.4 (3d Cir. 2001) ("[T]he District Court held that the rejection of a sexual advance was a protected activity, and that determination has not been questioned on appeal.  Therefore, we do not need to address it."); *Papp v. MRS BRO LLC*, No. 13-3183, 2015 WL 5247005, at *6 (D.N.J. Sept. 9, 2015) (citing Farrell and finding that "rejection of sexual advances in the Title VII . . . context, especially on multiple occasions as a part of a larger pattern of alleged sexual harassment, constitutes protected activity."); *Ogilvie v. N. Valley EMS, Inc.*, No.

---

[4]        The plaintiffs raise claims under both Title VII and the PHRA in the alternative in Count IX.  *See* (Am. Compl. ¶ 83–85.)  Because the PHRA is applied in accordance with Title VII, *Dici v. Pennsylvania*, 91 F.3d 542 (3d Cir. 1996), the Court's analysis of the substantive provisions of Title VII apply equally to any PHRA claims the plaintiffs may have.

07-485, 2008 WL 4761717, at *12 (E.D. Pa. Oct. 29, 2008) (citing Farrell and finding that "rejection of . . . sexual advances does constitute a protected activity under Title VII").

 To satisfy the second element of a retaliation claim, a plaintiff must allege facts to show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  Byrd alleges facts to support an adverse employment action: his suspension on August 5, 2015 and termination on August 27, 2015.[5]  (*Id.* ¶¶ 19, 23.)

 Finally, a plaintiff must allege facts to suggest a causal connection between the protected activity and the adverse employment action.   A plaintiff is not limited to one type of evidence to demonstrate causation.  *See Farrell*, 206 F.3d at 280–81.  Rather, the Court will evaluate the evidence as a whole, considering factors such as temporal proximity between the protected activity and adverse employment decision, intervening hostility, or inconsistent reasons given for the adverse action.  *Id.*  While an "unusually suggestive" temporal proximity can, on its own, show causation, the other factors noted above can show causation even where temporal proximity is not on its own unusually suggestive of retaliation.  *See id.* ("[A] plaintiff may establish the [causal] connection by showing that the employer gave inconsistent reasons for terminating the employee.").  "Courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reason given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of

---

[5] The other facts Byrd alleges do not rise to the level of an adverse employment action.  *See Reynolds v. Dep't of Army*, 439 Fed. App'x 150, 153 (3d Cir. 2011) (finding that an employee's placement on a performance improvement plan did not qualify as an adverse employment action)

causation when considered as a whole." *Connelly*, 809 F.3d at 793 n.11 (quoting *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)).

Although the Amended Complaint does not provide enough facts to show an unusually suggestive temporal proximity between Byrd's rebuff of King in late June or early July and his suspension on August 5, 2016, Byrd has alleged enough facts to survive a motion to dismiss. Byrd alleges he was subject to discipline between his report of sexual harassment and his termination, (*see id.* ¶¶ 13–16), and alleges facts to show inconsistent reasons for his termination. Byrd was initially fired for theft, (*id.* ¶ 23), though Elwyn later changed the purported reasons for firing him to lack of professionalism, disruptive behavior, and fighting (*id.* ¶ 31). These inconsistencies, coupled with the timing of Byrd's suspension upon his return from the Atlantic City business trip where he rebuffed King, are sufficient to survive a motion to dismiss.

The motion to dismiss Count I is denied.

## Count II — Retaliation

Count II of the Amended Complaint alleges that Elwyn retaliated against Abdussabur after she was fired. Abdussabur claims that Elwyn, in an effort to punish Byrd for filing his EEOC claim, retaliated against her by challenging, for the first time, her unemployment compensation benefits. (Compl. ¶ 41.)

Post-employment retaliation claims are actionable under Title VII. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997) (holding post-employment retaliation is an actionable claim under Title VII because "employee" in Title VII includes current and former employees alike). A former employee may bring a retaliation action for post-employment conduct when the former employer acts in retaliation for a protected activity that arose out of employment relationship. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200 (3d Cir. 1994); *see also Stezzi v. Citizens*

*Bank of Pa.*, No. 10-4333, 2012 WL 4717900 (E.D. Pa. Oct. 4, 2012) (plaintiff suing her former

employer because it challenged her unemployment benefits and labeled her "grossly negligent"

in their appeal).

Third parties may bring viable Title VII retaliation claims when they suffer retaliation

based "on the protected conduct of another individual." *Montone v. Jersey City*, 709 F.3d 181,

197 (3d Cir. 2013) (citing *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011)); *see also*

*Thompson*, 562 U.S. at 174 ("Title VII's antiretaliation provision prohibits any employer action

that well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." (internal quotation omitted)).  Without a categorical rule to determine viable

third parties, the question is whether a plaintiff "falls within the 'zone of interests' sought to be

protected" by Title VII's antiretaliation provision. *Thompson*, 562 U.S. at 178–79 (quoting

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)).

Abdussabur alleges a protected activity in the form of Byrd's EEOC charge against

Elwyn. *See* (Am. Compl. ¶ 41.)  To show an adverse employment action, Abdussabur alleges

Elwyn challenged, for the first time, her unemployment compensation benefits as a result of

Byrd's EEOC claim.  (*Id.*)  This is sufficient to survive a motion to dismiss. *Cf. Adamchik v.*

*Compservices, Inc.*, No. 10-949, 2010 WL 5139076 (W.D. Pa. Dec. 9, 2010).  Finally, the

temporal proximity between Byrd's EEOC charge and the challenge to Abdussabur's

unemployment benefits is unusually suggestive of a causal connection. *See, e.g., Zelinski v. Pa.*

*State Police*, 108 Fed. App'x 700, 706 (3d Cir. 2004) ("A discharge occurring two days after a

plaintiff filed an EEOC complaint is 'unusually suggestive.'").  The motion to dismiss Count II is

denied.

*Count III: Retaliatory Hostile Work Environment*

In Count III, Stevenson alleges a retaliatory hostile work environment claim. While this is a cognizable claim, *see Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006), *abrogated on other grounds by Burlington Northern*, 548 U.S. 53, the law governing this area is somewhat unsettled. *See Komis v. Perez*, No. 11-6393, 2014 WL 3437658 (E.D. Pa. July 15, 2014) (noting that "the law is unclear concerning the proper standard for retaliatory hostile work environment claims"); *Petrulio v. Teleflex Inc.*, No. 12-7187, 2014 WL 5697309 (E.D. Pa. Nov. 5, 2014) (acknowledging the confusion in the hostile work environment cases). *Petrulio* explains that to survive a 12(b)(6) motion on a retaliatory hostile work environment claim, a plaintiff must allege facts to plausibly show: (1) the plaintiff suffered intentional discrimination because of a protected activity; (2) the employer's intentional discrimination was severe or pervasive;[6] (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; (5) the plaintiff suffered materially adverse action or actions in relation to the hostile work environment; and (6) a basis for employer liability. *Petrulio*, 2014 WL 5697309, at *10.

The Court need not decide whether Stevenson satisfies the elements of a retaliatory hostile work environment claim because his claim is time barred. To bring a Title VII suit in Pennsylvania, a plaintiff "must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165

---

[6]     Under Burlington Northern, a plaintiff bringing a retaliation claim need only show that retaliation was materially adverse, not severe and pervasive. *Burlington Northern*, 548 U.S. 53, 67–68. However, "Burlington Northern involved a direct retaliation claim and nothing in that decision demonstrates an intent to alter the 'severe or pervasive' standard in the context of a retaliatory hostile work environment claim." *Petrulio*, 2014 WL 5697309 at *10 n.10. "Allowing a hostile work environment claim to proceed in the absence of severe or pervasive discrimination would be inconsistent with the purposes of Title VII, which is not intended to be a 'general civility code for the American workplace.'" *Id.* (citing *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998)).

(3d Cir. 2013) (citing 42 U.S.C. § 2000-e5(e)(1)).  Where the alleged discrimination is a discrete act, calculation of the 300-day time bar is simple.  Where the discrimination is not a single, discrete act, the Court must determine whether the behavior constitutes a "continuing violation." If so, as long as one instance of discrimination occurs within the 300 day look-back period, the claim is actionable.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

To determine whether a continuing violation exists, the Court must consider "a non-exhaustive list of factors to aid in distinguishing between the occurrence of isolated acts of discrimination and a persistent, ongoing pattern." *Mandel*, 706 F.3d at 166 (internal quotations omitted).  The two crucial factors are the subject matter and frequency of the alleged violations. *See id.* (noting that "permanency is [no longer] required to establish a continuing violation"). Violations share the same subject matter when they "constitute the same type of discrimination." *Id.* at 166 n.2.  Violations are frequent when "the harassment is 'more than the occurrence of isolated or sporadic acts of intentional discrimination.'"  *West v. Phila. Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995), *abrogated by Mandel*, 706 F.3d 157, *on other grounds*.

A hostile work environment claim "cannot be said to occur on any particular day." *Mandel*, 706 F.3d at 165 (quoting *Morgan*, 536 U.S. 101, 113 (2002)).  Such claims are by their nature "composed of a series of separate acts that collectively constitute one unlawful employment practice."  *Id.* (internal quotations omitted); *see also id.* at 165 (noting that ongoing discriminatory acts "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period" (internal quotations omitted).

To proceed, Stevenson must allege that at least one component of a continuing violation occurred on or after December 9, 2014—300 days before he filed his EEOC charge on October 5, 2015.  *See Morgan*, 536 U.S. at 116–17.  The alleged facts which could establish a hostile

14

work environment occurred well before the December 9, 2014 cutoff date, s*ee, e.g.*, (Am. Compl. ¶¶ 46–49); nothing after that date could be part of a continuing violation.  Stevenson does not allege frequent or persistent acts of the same subject matter in retaliation for reporting King's harassment in January 2014.  Rather, he points to a reassignment in February 2014 and a penalty for "swiping in late" in April 2014.  (*See id.* ¶¶ 48–49).  Those alleged acts occurring within the 300-day look-back period were "completely new behavior . . . out of nowhere," (*id.* ¶ 50), a simple request from the Employee Relations Generalist for minutes of interactions with King from the prior year, (*id.* ¶ 54), and a requirement to undergo fingerprinting in January 2016. (*Id.* ¶ 98.)  These allegations are neither part of the same subject matter as the initial discrimination nor are they frequent; they are accordingly not components of a continuing violation.  Stevenson's claim is time barred and any amendment would be futile.

*Count IV — Hostile Work Environment*

In Count IV all plaintiffs claim that Elwyn created a hostile work environment.  To state a claim for a hostile work environment under Title VII, the plaintiffs must allege facts to make it plausible that: (1) they suffered intentional discrimination because of their sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected them; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.  *Mandel*, 706 F.3d at 167 (citing Jensen, 435 F.3d at 449, *overruled on other grounds*).

Byrd alleges sufficient facts to state a hostile work environment claim.  He contends that King's comments toward him were because of his sex.  (*See* Am. Compl. ¶¶ 58(g), 58(dd), 58(jj).)  He also alleges sufficient facts to show that King's harassment was severe or pervasive.

Severe or pervasive discrimination effectively alters the terms and conditions of employment. *Selvato v. SEPTA*, 143 F. Supp. 3d 257, 265 (E.D. Pa. 2015) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  While this is a high hurdle, Byrd does not bear the burden of proving his prima facie case at the motion to dismiss stage.  *See Connelly*, 809 F.3d at 788–89. Byrd alleges he was subjected to sexually offensive comments in front of colleagues and other inappropriate advances over a span of three years, (*id.* ¶ 58(g), 58(k), 58(q)), and that the harassment included physical acts such as King groping him, (*id.* ¶ 18).  He also alleges facts to suggest King's behavior subjectively affected him by noting that it was unwelcome.  (*Id.* ¶¶ 5(8)(s), 64).  The facts alleged also suggest King's behavior would detrimentally affect a reasonable person in like circumstances, as her behavior persisted for more than two years, (*id.* ¶ 58), at times included sexually graphic comments, (*id.* ¶ 58(g)), and included physical touching, (*id.* ¶ 18).  Finally, Byrd alleges facts to support a finding that respondeat superior liability existed, (*id.* ¶ 59).  "An employer's vicarious liability for a hostile work environment depends upon whether the alleged offender is the plaintiff's supervisor with . . . authority over the employee."  *Hitchens v. Cty. of Montgomery*, No. 01-2654, 2002 WL 207180, at *3 (E.D. Pa. Feb. 11, 2002) (internal quotations omitted).  Here, the Plaintiffs have alleged that King was their supervisor and had authority over them.  *See* (Am. Compl. ¶¶ 59, 72.)  Elwyn's motion to dismiss with regard to Byrd's claim under Count IV is denied.[7]

Abdussabur fails to allege sufficient facts to state a hostile work environment claim.  She contends that King made a string of sexually inappropriate statements regarding Byrd in September or October 2012 and again in 2014, (*id.* ¶¶ 58(cc), 58(i)), and said she would "not

---

[7]    King's behavior toward Byrd is plausibly part of a continuing violation.  Byrd alleges facts to suggest that King's comments were both frequent and shared the same subject matter.  (*See* Am. Compl. ¶ 58.)  He also alleges that at least one act occurred within the limitations period (*see id.* ¶ 17.)  Byrd's hostile work environment claim is therefore not time barred.  *See Mandel*, 706 F.3d at 166–67.  Stevenson's hostile work environment claim is time barred and dismissed with prejudice for the reasons previously explained.  *See supra*, at 13–14.

hir[e] any more females in this department" in 2014, (*id.* ¶ 58(e)).  These facts do not suggest

that Abdussabur was subjected to a hostile work environment; unlike Byrd's allegations,

Abdussabur's allegations speak only to sporadic offensive comments.  *Cf. Selvato*, 143 F. Supp.

3d at 266.  Abdussabur's hostile work environment claim is dismissed with leave to amend.


*Count V — Quid Pro Quo Sexual Harassment*

In Count V, Byrd and Stevenson claim that they were subjected to *quid pro quo* sexual

harassment in violation of Title VII.  To state such a claim, plaintiffs must allege facts to show

they suffered unwelcome sexual advances, requests for favors or other verbal or physical sexual

conduct where: (1) submission to harassing conduct is made an explicit or implicit term or

condition of their employment; or (2) submission to, or rejection of, the conduct is "used as the

basis for employment decisions" affecting the plaintiff.  *Bonenberger v. Plymouth Twp.*, 132 F.3d

20, 27 (3d Cir. 1997) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 (3d Cir. 1997),

*overruled on other grounds by Burlington Northern*, 548 U.S. 53).  In essence, "the plaintiff must

plead a causal nexus between his response to unwanted sexual advances and a later decision that

affected a term of his employment.'"  *Pittman v. Bob*, No. 11-00842, 2012 WL 3580157, at *6

(W.D. Pa. Aug. 17, 2012), *aff'd*, 520 F. App'x 101 (3d Cir. 2013) (citing *Farrell*, 206 F.3d at 281–

84); *see also Emmanuella Cherisme v. AIDS Care Grp.*, No. 15-6420, 2016 WL 3997237, at *3

(E.D. Pa. July 26, 2016) ("In cases where a plaintiff has refused to submit to sexual advances, an

actual change in employment conditions is required to state a *quid pro quo* claim.  That is, a

plaintiff must demonstrate either that she submitted to the sexual advances of her alleged

harasser or suffered a tangible employment action as a result of her refusal to submit to those

sexual advances." (internal citations and quotations omitted)).

It is unclear whether Byrd has stated a valid claim at this point. Byrd alleges King conditioned satisfactory approval of his "New Employee Introductory Period" on him refraining from reporting her harassment and on his "tolerance for her unwelcome conduct." (Am. Compl. ¶ 61.) While this demand is sufficient to survive a motion to dismiss Byrd's *quid pro quo* claim, Byrd has not alleged when his new employee introductory period concluded. The Court dismisses Count V as to Byrd with leave to amend so that Byrd can include facts to show that the introductory period concluded after November 27, 2014—three hundred days before Byrd filed his charge with the EEOC. If the introductory period concluded before that date, Byrd's *quid pro quo* claim is time barred.

Stevenson's claim is time barred. Stevenson must allege that at least one component of the *quid pro quo* occurred on or after December 9, 2014. *See Morgan*, 536 U.S. at 113. Stevenson contends that he rebuffed King's advances in January 2014 and was subjected to undesirable, humiliating, and onerous work duties in February 2014. (Am. Compl. ¶ 48.) He also claims King requested his disciplinary paperwork for arriving late in September 2015. (*See id.* ¶ 49.) Neither helps him here. The facts alleged do not establish a plausible claim that King's September 2015 request for paperwork altered a term of Stevenson's employment, nor do they suggest a continuing violation. The Complaint itself notes that King's September 2015 request was "completely new behavior out of nowhere," (*id.* ¶ 50), rather than part of the same subject matter as the reassignment of duties Stevenson suffered in February 2014. The same may be said of Stevenson's allegation that he was subjected to an FBI fingerprint analysis by a different supervisor for rebuffing King's sexual advances nearly two years before. (*See id.* ¶ 98.)

Count V of the Amended Complaint with regard to Stevenson is dismissed with prejudice as amendment would be futile. Byrd's Count V is dismissed with leave to amend so that he may

attempt to plead sufficient facts to determine whether any part of his claim falls within the 300 days preceding his EEOC complaint.

Count VIII — Discriminatory Discharge on the Basis of Sex[8]

Count VIII alleges Byrd was discriminated against on the basis of his sex when Elwyn fired him.  Byrd must allege facts to plausibly find "that the employer is treating some people less favorably than others" based on a protected classification.  *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999).  "[T]o maintain a claim under Title VII, at the motion to dismiss stage, a Plaintiff need not allege facts to satisfy the initial prong of *McDonnell Douglas*[.]  [I]n other words, he need not demonstrate a prima facie case of illegal employment discrimination."  *Depelligrin v. A& L Motor Sales, LLC*, No. 11-01579, 2012 WL 3073182, at *3 (W.D. Pa. July 27, 2012) (citing *Swierkiewicz v. Soreman N.A.*, 534 U.S. 506 (2002)).

While Byrd need not establish his prima facie case, he must still state a plausible claim. *Twombly*, 550 U.S. at 555.  Byrd alleges that when he was fired, two women took over his position.  (*Id.* ¶ 81.)  This fact does little to support a claim that he was terminated because of his gender.  Byrd also alleges that he asked to be considered for a promotion and was told there were no open positions, (Am. Compl. ¶ 73), and yet Elwyn "promoted and/or hired" six women during the same time period, (*id.* ¶ 74).  Without more, this does not suggest that Byrd was treated less favorably because he was a man.  Byrd does not allege that the promoted women were elevated to positions that would have been a promotion from his own position, nor does he allege how many of the six women were promoted and how many were hired.  Based on the sparse facts included in the Amended Complaint on this issue, Byrd's allegations do not plausibly suggest he was treated unfavorably based on his sex.

---

[8]      Plaintiffs' counsel withdrew Counts VI and VII at oral argument.  (Tr. of Oral Arg., at 85, ECF No. 22.)

Count VIII is dismissed with leave to amend so that Byrd may attempt to allege sufficient facts to show that he was treated less favorably than other workers because of his sex.

## _Count X — Family and Medical Leave Act Interference_

Count X purports to state a claim for FMLA interference on behalf of Stevenson.  To survive a motion to dismiss, Stevenson must allege that he: (1) was an eligible employee under the FMLA; (2) the defendant is an employer subject to FMLA requirements; (3) he was entitled to FMLA leave; (4) he gave the employer notice of his intent to take leave; and (5) the employer denied the plaintiff the FMLA benefits.  _De Luca v. Trs. of U. of Penn._, 834 F. Supp. 2d 282, 290 (E.D. Pa. 2011) (citing _Cavin v. Honda of Am. Mfg., Inc._, 346 F.3d 713, 719 (6th Cir. 2003)).

Stevenson alleges sufficient facts to show that Elwyn was a qualifying employer.  He worked at Elwyn for at least twelve months and for at least 1,250 hours during the previous twelve-month period, (Am. Compl. ¶ 90), and alleges that Elwyn employed over fifty employees for each working day of twenty or more calendar weeks as required by the statute, (_id._ ¶ 87).  Stevenson fails, however, to sufficiently allege that he was entitled to FMLA leave.  Specifically, he does not allege facts to support his otherwise conclusory statement that he suffered a "serious health condition."  (_See_ Am. Compl. ¶¶ 90–91); _see also Michels v. Sunoco Home Comfort Serv._, No. 04-1906, 2004 WL 2897945, at *3 (E.D. Pa. Dec. 13, 2004) ("Determining whether an illness qualifies as a serious health condition for purposes of the FMLA is a legal question, which a plaintiff may not avoid merely by alleging his condition to be so." (internal quotations omitted)).  The Court will dismiss Count X with leave to amend so that Stevenson may allege,

*inter alia*, facts which could establish that he suffered from a "serious health condition" as defined by 29 U.S.C. § 2611(11).[9]

<u>Count XII — Family and Medical Leave Act Retaliation</u>[10]

In Count XII Byrd alleges FMLA retaliation against Elwyn.  To survive a motion to dismiss, Byrd must allege facts to show: (1) that he invoked his FMLA right to leave; (2) that he suffered an adverse employment decision; and (3) the adverse action was causally connected to the plaintiff invoking his right to FMLA leave.  *Lichtenstein v. Univ. of Pitt. Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012).  An employee need not expressly assert or even mention his rights under the FMLA to properly invoke his rights for the purposes of an FMLA retaliation claim.  *Id.* at 303.  To invoke his rights under the FMLA, however, an employee must provide adequate notice to the employer about his need to take medical leave.  *Id.* at 303 (citing 29 U.S.C. § 2612(e)(2) (providing for a thirty day notice period where leave is foreseeable)).  Where the need to take FMLA leave is unforeseeable, the employee must provide "sufficient information for an employer to reasonably determine whether the FMLA *may* apply to the leave request."  *Id.* at 303 (internal quotations and citations omitted).

Byrd contends he told his supervisor that he required surgery for "a serious health condition" on or about July 24, 2015.  (Am. Compl. ¶118.)  He also asserts that his subsequent suspension and discharge were causally related to his request and attempt to secure FMLA leave.  (*Id.* ¶ 120.)  However, Byrd fails to assert facts to show that he either gave a thirty-day notice or

---

[9]      A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves—
          (A)  inpatient care in a hospital, hospice, or residential medical care facility; or
          (B)  continuing treatment by a health care provider.
29 U.S.C. § 2611(11).
[10]      Plaintiffs' counsel withdrew Count XI at oral argument.  (Tr. of Oral Arg. 94–95.)

that his need for leave was unforeseeable as required by the statute. *See* 29 U.S.C. § 2612(e)(2). Byrd alleges an adverse employment decision by noting his August 5, 2016 suspension and his August 27, 2016 firing. (Am. Compl. ¶¶ 19, 23.) Given that Byrd failed to allege facts to show that he meets the first element of the test for FMLA retaliation, the court need not engage in an analysis of the causation element at this time. The Court will dismiss Count XII with leave to amend so that Byrd may attempt to allege facts to support a finding that he provided Elwyn with sufficient notice to invoke his right to FMLA leave under 29 U.S.C. § 2612(e).

### *Defendants' Motion to Strike*

Under Federal Rule 12(f), the Court may strike "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Elwyn moves to strike all allegations relating to events before the 300 day look-back period on the grounds that those factual allegations are impertinent. (Def's. Mot. to Dismiss and Mot. to Strike, ECF No. 15, at 21.) Even the time-barred allegations are, however, relevant to the analysis of whether King's behavior was part of a continuing violation with regard to Counts III and IV. Elwyn's motion to strike is denied.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.